IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

        Plaintiff,

v.                               Criminal No. 3:06CR387
                               Hon. Robert E. Payne

LAMONT E. McCORD,

        Defendant.

**MOTION FOR COMPASSIONATE RELEASE PURSUANT TO SECTION 603(b) OF THE FIRST STEP ACT**

The defendant, Lamont E. McCord, through counsel, respectfully moves this Court to grant his motion for compassionate release pursuant to Section 608(b) of the First Step Act, and 18 U.S.C. § 3582(c)(1)(A). Counsel respectfully request that this Court excuse counsel for filing said motion out of time.

Mr. McCord respectfully requests that this Court order that the remainder of his sentence to be served on home confinement or, in the alternative, issue a non-binding recommendation that the Bureau of Prisons ("BOP") transfer him to home confinement for the duration of his sentence, pursuant to 18 U.S.C. § 3624(c), the CARES Act, and Attorney General Barr's April 3, 2020 and April 22, 2020 Memoranda. This motion should be granted because the global COVID-19 pandemic combined with Mr. McCord's medical condition present an "extraordinary and compelling reason" for compassionate release.

Mr. McCord is particularly susceptible to COVID-19 and is more likely to suffer dire consequences from the virus due to his medical condition. Mr. McCord's

incarceration at FCI Williamsburg exposes him to a particularized risk of contracting the disease. The virus thrives in densely packed populations, and FCI Williamsburg is ill-equipped to contain the pandemic and prevent COVID-19 from spreading to inmates like Mr. McCord. Reducing his sentence, and allowing him to serve out a period of home incarceration at his mother's home is the only prudent and just response to the extraordinary and compelling circumstances created by the novel coronavirus.

Any perceived danger that Mr. McCord may pose to the community can be mitigated through home incarceration, and his release plan adheres to the mandates of Section 3553(a), particularly in light of the cataclysmic events of this pandemic. We respectfully ask the Court to consider this motion on an expedited basis.

## FACTUAL BACKGROUND

Mr. McCord entered guilty pleas to conspiracy to distribute a detectable amount of heroin and 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846 (Count 1); use of a firearm in furtherance of a drug crime causing the death of another, in violation of 18 U.S.C. § 924(c), 924(j), and 2 (Count 2); and conspiracy to use and carry a firearm in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(o) (Count 3). This Court initially sentenced him to 360 months' imprisonment as to Count 1, 180 months' consecutive as to Count 2, and 240 months' as to Count 3, for a total sentence of 540 months' imprisonment. That sentence was eventually reduced to a total sentence of 324 months' imprisonment.

As stated earlier, Mr. McCord is currently incarcerated at the Federal Correctional Institution, Williamsburg. His projected release date is September 5, 2029. He currently has approximately 9 more years to serve, thus, he has served approximately 67% of his sentence.

Mr. McCord has been advised to request that the warden move for compassionate release on the same grounds as submitted herein. Because of the urgency of the spread of COVID-19, both nationally and within the federal prison system, we respectfully ask the Court to waive the 30-day waiting period after this submission for the Court to order compassionate release. Delaying resolution of Mr. McCord's motion would expose him to undue prejudice considering the rapid development of the pandemic and the significant risk of death.[1]

## SUMMARY OF ARGUMENT

*First*, the Court should exercise its authority to grant Mr. McCord's Motion for Compassionate Release without requiring full exhaustion or "the lapse of 30 days" from the warden's receipt of his request. See 18 U.S.C. § 3582(c)(1)(A). Courts across the country have waived the 30-day waiting period in response to the unprecedented threat of COVID-19. By enacting the First Step Act of 2018, Congress amended § 3582 to eliminate the BOP as the sole gatekeeper of compassionate release after

---

[1] As an alternative to granting immediate relief, the Court may defer ruling on this motion until the end of the 30-day waiting period. Section 3582(c)(1)(A)'s 30-day waiting period does not prevent a defendant from *filing* a motion prior to the expiration of the 30-day waiting period. *See United States v. Gross*, 2020 WL 1862251 (S.D.N.Y. Apr. 13, 2020) (deferring compassionate release grant until 30 days after the warden's receipt of the defendant's request for compassionate release).

BOP's documented failure to "properly manage the compassionate release program."[2] Now, a defendant can seek relief directly from a sentencing court as early as 30 days after submitting a request to a warden asking for the BOP to file such a motion, or after completing an administrative appeal process, whichever occurs first.  This 30-day waiting period is a claims processing rule that addresses who files a compassionate release motion; it is not a jurisdictional bar to the Court's exercise of its authority to grant release.  This Court should waive the 30-day waiting period to achieve Congress's manifest intent and to protect Mr. McCord from undue prejudice.

**Second,** this Court should exercise its authority to grant Mr. McCord compassionate release because the COVID-19 pandemic combined with his unique susceptibility to COVID-19, given his medical issues, is an "extraordinary and compelling" reason warranting relief.  As long as Mr. McCord remains incarcerated, he faces an unacceptable risk of contracting and dying from COVID-19.  As of May 25, BOP reported that 4,759 inmates and 589 BOP staff members have tested positive for COVID-19; 59 federal inmates have died as a result.[3]  These figures under-estimate COVID-19's real toll "given the paltry number of tests the federal

---

[2] Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program*, at 11 (April 2013); *see also* Department of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, at 51 (May 2015) ("Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population, few aging inmates have been released under it.").

[3] Fed. Bur. of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/ (includes recovered cases).

government has made available" at some BOP facilities,[4] and because BOP only announced on April 23 that it would begin to test asymptomatic inmates, and has only done so at select facilities.[5]  According to BOP Director Michael Carvajal, "more than 30% of our federal prisons are currently affected," including 51 BOP facilities and 30 Residential Re-Entry Centers, and "institutions such as Oakdale, Elkton, Danbury, Lompoc, Butner, Yazoo City, Forrest City, and Milan are 'hotspots' for COVID-19."[6]

The alarming spread of COVID-19 in BOP facilities confirms that, despite its efforts, BOP cannot safeguard prisoners.  For example, from April 21 through April 29 – more than three weeks after BOP implemented Phase 5 of its COVID-19 Action Plan and inmate quarantine – Terminal Island FCI reported a 1,000% percent increase of new positive cases (from 57 inmates to 570 inmates).[7]  This is not an

---

[4] *See, e.g., Wilson v. Williams*, No. 4:20-cv-00794, 2020 WL 1940882, at *2 (N.D. Ohio Apr. 22, 2020) (FCI Elkton received only 50 tests); *see also Louisiana federal prison no longer testing symptomatic inmates for coronavirus due to 'sustained transmission'*, The Lens (Mar. 31, 2020), available at https:// thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/

[5] *Federal prison system expands virus testing to find hidden asymptomatic infections*, USA Today (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/23/coronavirus-federal-prisons-expand-testing-asymptomatic-inmates/3015287001/; *BOP Expands COVID-19 Testing: Rapid Testing Available at Select Facilities*, Fed. Bureau Prisons (Apr. 24, 2020), https://www.bop.gov/resources/news/20200424_expanded_testing.jsp

[6] BOP Direct Michael Carvajal's Message to Prison Staff (Apr. 10, 2020), Transcript available at https://prisonology.com/wp-content/uploads/2020/04/COVID-19-Video-transcript-of-BOP-Director-Michael-Carvajal.pdf

[7] Fed. Bur. of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/.

outlier: during the same period, Fort Worth FMC positive inmate cases increased from 35 to 298, and at Butner Medium I cases increased from 27 to 212.[8]  Courts have criticized BOP's overall response as "insufficient" given "the number of infections and deaths which have already occurred in federal custodial institutions,"[9] and one court described BOP efforts at FCI Elkton as fighting "a losing battle.  A losing battle for staff.  A losing battle for inmates."  *Wilson v. Williams*, No. 4:20-cv-00794, 2020 WL 1940882, at *1 (N.D. Ohio Apr. 22, 2020).  Certainly, the BOP's decision to only test

Even in the best circumstances, inmates cannot provide self-care because their incarceration prevents them from following CDC guidance: "People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment."  *United States v. Skelos*, 15-CR-317 (KMW), 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020).  There are serious doubts that BOP will be able to adequately care for prisoners as the COVID-19 pandemic continues to unfold.[10]  For

---

[8] The Marshall Project, *Tracking the Spread of Coronavirus in Prisons* (Apr. 24, 2020), available at https://www.themarshallproject.org/2020/04/24/tracking-the-spread-of-coronavirus-in-prisons ("The number of new cases among prisoners is more than doubling each week . . . .").

[9] *United States v. Joling*, No. 6:11-cr-60131-AA, 2020 WL 1903280, at *5 (D. Or. Apr. 17, 2020).

[10] The Inspector General has found widespread medical staffing shortages across BOP facilities that "lower staff morale, increase staff workload, and ultimately can reduce inmates' access to routine medical care."  *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, Office of the Inspector General (March 2016), available at https://oig.justice.gov/reports/2016/e1602.pdf.

these reasons, federal courts nationwide have held that COVID-19 constitutes an extraordinary and compelling basis for ordering compassionate release for defendants facing a rapidly growing mortal threat from exposure to the coronavirus in federal prisons.[11]  In light of the specific threat Mr. McCord faces, this Court should do the same.

**Third**, Mr. McCord's release to home incarceration will sufficiently satisfy the purposes of sentencing under 18 U.S.C. § 3553(a) factors warrant Mr. McCord's release.

## ARGUMENT

### I.   The Court Has Jurisdiction To Grant Mr. McCord's Compassionate Release Without Delay.

By enacting the landmark First Step Act of 2018, Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to allow, for the first time, defendants to move on their own behalf for a reduction of sentence.  A defendant may file such a motion when he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier*[.]"  First Step Act of 2018, § 603(b), Pub. L. 115- 391, 132 Stat. 5194, 5239 (Dec. 21, 2018) (emphasis added).  Congress selected the 30-day waiting period in order to expedite defendants' access to the courts and the courts' consideration of

---

[11]  The Office of the Federal Public Defender has complied and updated a list of cases from courts across the country that have granted compassionate release in a variety of cases in light of COVID-19.  As of May 25, the list includes 185 cases.  If this Court wishes, the list can be filed in a supplemental pleading.

compassionate release motions.  *See, e.g., United States v. Haney*, 19-cr-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020).

Here, while the 30-day waiting period has not yet passed, this Court should address this matter without delay.  Section 3582(c)(1)(A)'s 30-day waiting period is a claims processing rule that describes who files a compassionate release motion; it is not a jurisdictional bar to the Court's authority to grant compassionate release. Because it is not a jurisdictional bar, and in light of Congress's clear intent to expand and expedite compassionate release, the 30-day waiting period provision is subject to well-recognized exceptions to administrative exhaustion schemes.  In particular, the Court should not require a 30-day delay because waiting would be futile and would cause Mr. McCord undue prejudice in light of the mortal threat posed by the rapid spread of the virus in prison populations and Mr. McCord's particular susceptibility to serious illness and death from the virus.

A. <u>The 30-day waiting period is not a jurisdictional requirement.</u>

The Court may grant a sentence reduction now because § 3582(c)(1)(A)(i) addresses only the process for filing a motion; it does not restrict the Court's jurisdiction to grant compassionate release.  The Supreme Court has "stressed the distinction between jurisdictional prescriptions and non-jurisdictional claim-processing rules, which seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times."  *Fort Bend*

*Cty., Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019).[12]  To distinguish between the two, a court applies a "readily administrable bright line" standard: it inquires whether Congress has "clearly stated that the rule is jurisdictional."  *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) (citation omitted).  When Congress does not clearly create a jurisdictional bar, "courts should treat the restriction as nonjurisdictional in character."  *Davis*, 139 S. Ct. at 150 (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006)).

Courts apply the "clear statement" bright line standard by "considering the statutory text (if it speaks in 'jurisdictional terms'); the placement of the rule (if it is located in the jurisdiction-granting provision of the statute); and legislative context." *Stewart v. Iancu*, 912 F.3d 693, 699-700 (4th Cir. 2019).  All of these considerations establish that the administrative exhaustion provision of 18 U.S.C. § 3582(c)(1)(A)(i) functions merely as a claims processing rule, not a jurisdictional requirement.

      i.  <u>The statutory text confirms the 30-day waiting period is not jurisdictional.</u>

The statutory text of § 3582(c)(1)(A does not address the courts' jurisdiction; it merely promotes the "orderly progress of litigation" by stipulating *which party* will file a compassionate release motion, and allows prisoners to move on their own behalf after 30 days from BOP receipt of an inmate's request to file such a motion.  "A statutory condition that requires a party to take some action before filing a lawsuit

---

[12] *See also Henderson v. Shinseki*, 562 U.S. 428, 435 (2011) (claims processing rules "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times").

is not automatically 'a *jurisdictional* prerequisite to suit'"; instead, "the jurisdictional analysis must focus on the 'legal character' of the requirement." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010) (emphasis in original); *see also Stewart*, 912 F.3d at 701 ("Simply because [Title VII's] 180-day waiting period is 'cast in mandatory language' does not render it jurisdictional."). And here, the legal character of the 30-day waiting period "simply delineates the process for a party to obtain judicial review, [and does] not refer[] to the adjudicatory capacity of courts." *Haney*, 2020 WL 1821988, at *3 (concluding that "the exhaustion requirement in § 3582(c)(1)(A) is a claim-processing rule that does not deprive this Court of jurisdiction").

ii. <u>The placement of the 30-day waiting period confirms it is not jurisdictional.</u>

The "exhaust or wait 30 days" provision is not placed in the jurisdiction-granting provision of the statute; it is in the "part of the chapter dealing generally with sentences of imprisonment." *See United States v. Taylor*, 778 F.3d 667, 671 (7th Cir. 2015). "Tellingly, the word 'jurisdiction' or its variation never appears" in § 3582. *Haney*, 2020 WL 1821988, at *3. Moreover, § 3582 as a whole expressly ***confirms*** the courts' sentencing modification authority. Though § 3582(c) states that the "court may not modify a term of imprisonment once it has been imposed," that provision follows § 3582(b), which states that "a sentence to imprisonment can subsequently be" modified "pursuant to" certain provisions. In short, § 3582(c)(1)(A) merely sets forth a procedure "pursuant to" which sentence modifications are made; it does not divest or condition the court's jurisdiction.

iii. <u>The unique structure and legislative context of the 30-day waiting period confirms it is not jurisdictional.</u>

10

By enacting the First Step Act, Congress removed the BOP as the sole gatekeeper of compassionate release and expedited defendants' access to the courts. In allowing defendants to seek compassionate release directly from federal courts, Congress implemented a modest procedural hurdle – "either exhaust or wait 30 days" – that "substantially reduces the importance" of protecting BOP authority by allowing "a defendant to come to court before the agency has rendered a final decision." *Haney*, 2020 WL 1821988, at *3.

Moreover, the First Step Act followed the Inspector General's critical assessment of the previous compassionate release framework: "not all [BOP] institutions have timeliness standards, and for those institutions that do, the timeframe ranges from 5 to 65 days"; "the process available to inmates to appeal a Warden's or Regional Director's denial of a compassionate release request can take up to more than 5 months to complete"; and that "BOP cannot determine if requests are processed in a timely manner because the BOP does not track the time it takes to approve or deny requests."[13]

Congress intended to expand and expedite judicial review of compassionate release motions, and it chose the unique 30-day waiting period to effect that result. Treating the 30-day waiting period as jurisdictional would ignore the statutory structure and thwart these purposes by abdicating the authority that Congress intends the Courts to exercise.

---

[13] Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program*, at ii-iii (April 2013).

iv. <u>Treating the 30-day waiting period as non-jurisdictional is most consistent with Fourth Circuit precedent.</u>

Though the Fourth Circuit has not addressed whether the 30-day waiting period in § 3582(c)(1)(A) is jurisdictional,[14] it has provided instructive guidance in addressing a similar exhaustion provision in Title VII of the Civil Rights Act of 1964. *See Stewart*, 912 F.3d at 699-704. Section 2000e-16(c) of Title VII allows employees and job applicants to bypass administrative exhaustion of their discrimination claims when a government agency fails to "take final action" within 180 days of filing an initial complaint.

As the Fourth Circuit noted, "[u]nlike most administrative exhaustion requirements premised on agency action . . . the 180-day waiting period is satisfied by agency *inaction*." *Id.* Moreover, "Congress passed Section 2000e-16(c) of Title VII in 1972 precisely because of its recognition that federal employees frequently encountered an 'administrative quagmire' in filing charges of discrimination." *Id.* at 699. The Fourth Circuit thus concluded that Title VII's 180-day waiting period is "akin to a 'claim-processing' rule that imposes procedural obligations on litigants . . . [and] is not jurisdictional." *Id.* at 701. Because the 30-day waiting period under § 3582(c)(1)(A) is likewise satisfied by agency inaction, and was enacted to counteract prisoners' inability to seek compassionate release, the  same reasoning applies here.

---

[14] The Fourth Circuit has held that the implicit prohibition on motions to reconsider a sentence reduction pursuant to § 3582(c)(2) based upon a retroactive amendment to the Sentencing Guidelines is not jurisdictional and may be waived. *See United States v. May*, 855 F.3d 271, 274-75 (4th Cir. 2017) (recognizing a "nonjurisdictional" bar to § 3582(c)(2) based motions for reconsideration).

B. <u>Waiver of the 30-day waiting period is consistent with Congressional intent.</u>

This Court may waive the 30-day waiting period if waiver is consistent with Congress's intent as evidenced by the statutory context and purposes.  In particular, where "Congress wanted more oversight by the courts," even a statutory exhaustion requirement may be "excused by the courts."  *Smith v. Berryhill*, 139 S. Ct. 1765, 1774, 1776 (2019).  Here, Congress plainly intended to expand and expedite compassionate release by giving prisoners a direct path to the Courts.

Because it allows complete circumvention of BOP action after the lapse of 30 days, Section 3582's exhaustion provision undercuts the typical purposes of administrative exhaustion: allowing an agency to apply its expertise; preventing premature judicial interference; and compiling an administrative record to aid judicial review.  While BOP may recommend cases to the Court, the statutory scheme does not depend on BOP's recommendations, and the Court must ultimately decide whether to grant relief in all cases regardless of BOP's consideration.  *United States v. Soto*, No. 1:18-cr-10086-IT, 2020 WL 1905323, at *5 (D. Mass. Apr. 17, 2020) ("[A]lthough waiting thirty days may simplify matters for the court where the BOP joins the motion, the waiting period generally will not eliminate the need for judicial involvement.").  The provision thus "does not reflect unqualified commitment to administrative exhaustion," to the contrary, it "reflect[s] acknowledgement that the judiciary has an independent interest in, and responsibility for, the criminal judgments it is charged with imposing."  *United States v. Russo*, 16-cr-441 (LJL), 2020 WL 1862294, at *6 (S.D.N.Y. Apr. 14, 2020) (emphasis added).

Congress could not predict the unprecedented threat that prisoners face from COVID-19, but the 30-day waiting period was designed to prevent inequitable results in similar circumstances where BOP's many demands prevent it from promptly considering compassionate release requests.  Given "the multiple demands that the BOP has faced for many years in this era of mass incarceration [the Court] can reasonably infer that Congress recognized that there would be many cases where the BOP either could not act within 30 days on such a request or, even if it did act, its review would be superficial." *Haney*, 2020 WL 1821988, at *3.  The statutory text reflects that "Congress was determined not to let such exigencies interfere with the right of a defendant to be heard." *Id.*  "In essence, the 30-day rule was meant as an accelerant to judicial review . . . . and it would pervert congressional intent to treat it as a substantial obstacle to effective judicial review." *United States v. Russo*, No. 16-cr-441 (LJL), ECF No. 54, at 5 (S.D.N.Y. Apr. 3, 2020); *United States v. Atwi*, No. 18-20607, 2020 WL 1910152, at *3 (E.D. Mich. Apr. 20, 2020) ("Congress contemplated that a defendant would be able to seek court redress quickly. But 30 days when the statute was passed and 30 days in the world of COVID-19 are very different."). Accordingly, when "BOP has not been able to satisfy its obligation to act expeditiously . . . or to assure the Court it can do so . . . the Court can exercise the power Congress has given it" in the extraordinary circumstances of COVID-19.  *Russo*, 2020 WL 1862294, at *7.[15]

---

[15] S*ee also United States v. Scparta*, No. 18-cr-578 (AJN), 2020 WL 1910481, at *7 (S.D.N.Y. Apr. 20, 2020) ("In short, a strict application of the statute's exhaustion requirement would foreclose judicial review for inmates like Mr. Scparta, therefore

The statute's plain text—both its distinctive structure and its title—therefore supports application of equitable exceptions.

    C.  <u>The Court should waive exhaustion because Mr. McCord is at grave risk of contracting a fatal disease and pursuing administrative remedies would be futile and unduly prejudicial.</u>

Because the § 3582(c)(1)(A) waiting period is non-jurisdictional, the Court may excuse Mr. McCord's failure to exhaust his administrative remedies if: (1) exhaustion would be futile; (2) the administrative process is incapable of granting adequate relief; or (3) pursuing agency review would subject Mr. McCord to undue prejudice. *See, e.g., Orr v. Assurant Employee Benefits*, 786 F.3d 596, 602 (7th Cir. 2015).[16] As Judge Jackson recently held, "[t]he COVID-19 pandemic, which could result in catastrophic health consequences for petitioners vulnerable to infection, implicates all three exceptions justifying the waiver of the exhaustion requirement." *United States v. Poulios*, No. 2:09-cr-00109-RAJ-TEM, 2020 WL 1922775, at *1 (E.D. Va. Apr. 21, 2020).

Indeed, given COVID-19's unprecedented and unique threat to people confined to prisons, courts throughout the country have applied these well-recognized exceptions in waiving exhaustion under § 3582(c)(1)(A). *See, e.g.*, *Haney*,

---

posing risk to prisoners, guards, and the public—the opposite of the First Step Act's legislative purpose."); *cf. Gonzalez v. Thaler*, 565 U.S. 134 (2012) ("Treating § 2253(c)(3) as jurisdictional also would thwart Congress' intent in AEDPA to eliminate delays in the federal habeas review process.") (quotation omitted); *Stewart*, 912 F.3d at 703 ("Our conclusion also comports with the broader purpose of Title VII as a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process.").

    [16] *See also Garza v. Davis*, 596 F.3d 1198, 1203-04 (10th Cir. 2010) (recognizing futility exception in context of § 2241 petition);

2020 WL 1821988, at *4 ("Congressional intent not only permits judicial waiver of the 30-day exhaustion period, but also, in the current extreme circumstances, actually ***favors*** such waiver, allowing courts to deal with the emergency before it is potentially too late.") (emphasis added); *United States v. Jones*, No. 3:11-cr-249, Dkt. No. 47 (E.D. Va. Apr. 3, 2020) ("Given Jones's unique circumstances and the exigency of a rapidly advancing pandemic, requiring Jones to exhaust administrative remedies would result in undue prejudice and render exhaustion of the full Bureau of Prisons administrative process both futile and inadequate.").[17]

### i. Futility

Pursuing administrative remedies would be futile in this case because BOP has presumptively deemed Mr. McCord ineligible for relief.  BOP represents that, on March 26, it "began immediately reviewing all inmates who have COVID-19 risk

---

[17] *See also United States v. Sawicz*, 08-cr-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) ("The delay that the defendant would experience if he had to wait for thirty days to expire before pursuing a motion for compassionate release in this court would put him at significant risk of suffering catastrophic health consequences."); *United States v. Colvin*, No. 19-cr-179, 2020 WL 1613943, at * 2 (D. Conn. Apr. 2, 2020) (requiring exhaustion would subject defendant to "undue prejudice – the heightened risk of severe illness – while attempting to exhaust her appeals"); *United States v. McCarthy*, No. 3:17-CR-0230, 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (waiving exhaustion where defendant's "age and underlying health issues, when considered in light of the spread of COVID-19, demonstrate that further delay could likely result in such catastrophic health consequences, including death"); *United States v. Zukerman*, 16 CR 194, 2020 WL 1659880, at *4 (S.D.N.Y. Apr. 3, 2020) (Defendant's "advanced age and compromised health, combined with the high risk of contracting COVID-19 at Otisville, justify waiver of the exhaustion requirement."); *United States v. Perez*, No. 17-cr-513-3, 2020 WL 1546422, at *1 (S.D.N.Y. Apr 1, 2020) (Defendant's "exhaustion of the administrative process [under the First Step Act] can be waived in light of the extraordinary threat posed – in his unique circumstances – by the COVID-19 pandemic.").

factors . . . to determine which inmates are suitable for home confinement."[18]  Because BOP has not identified Mr. McCord for early release or home confinement, and because BOP has made no representation that it intends to grant his request, the Court can find that BOP has deemed him unsuitable for home confinement or early release.  Accordingly, it would be futile for Mr. McCord to pursue his administrative remedies.[19]

ii.  <u>Inadequate relief</u>

Second, any relief that could be granted through the administrative process would be plainly inadequate because it would require Mr. McCord to suffer irreparable harm by continuing to face the lethal threat of COVID-19.  BOP typically takes months to address inmate requests for compassionate release even under better conditions.[20]  Given the pandemic, the system is undoubtedly overwhelmed, further delaying the process, and exposing Mr. McCord to an increasing risk of infection, serious illness, and even death.  That risk is an irreparable harm that renders relief inadequate.  *See, e.g., United States v. Gileno*, No. 3:19-cr-161-(VAB)-1, 2020 WL

---

[18] Fed. Bur. of Prisons, COVID-19 Home Confinement Information, available at https://www.bop.gov/coronavirus/

[19] *Cf. United States v. Chatelain*, No. 1:19-cr-133, Dkt. No. 73 (E.D. Va. May 1, 2020) (requiring defendant to appeal or wait 30 days "would be futile and inadequate and would subject [defendant] to undue prejudice" where BOP issued a pro forma denial of defendant's compassionate release request).

[20] See BOP Report on Compassionate Release, at ¶G (showing that nonterminal-illness compassionate release requests took on average between 58 and 117 days to be addressed by the BOP).

1916773 (D. Conn. Apr. 20, 2020) ("An unyielding view of the exhaustion requirement is likely to render the BOP incapable of granting adequate relief . . . .").

### iii.  Undue prejudice

Finally, forcing Mr. McCord to exhaust his administrative remedies will be unduly prejudicial.  His health is negatively impacted by the outbreak even though he has not yet been infected.  The conditions within BOP facilities prejudice his ability to follow the CDC's hygiene and social distancing recommendations, which prejudices his ability to avoid infection, in an environment extremely conducive to spread the virus.  Most significantly, Mr. McCord could become extremely ill (or worse), a prejudice that is plainly undue.  *See Poulios*, 2020 WL 1922775, at *3 ("[P]reservation of the exhaustion requirement could subject Petitioner to severe illness and death if he contracts COVID-19 because of his underlying health conditions."); *United States v. Love*, No. 1:14-cr-4-1, Dkt. No. 41 (W.D. Mich. Apr. 21, 2020) ("[A] 30-day delay would likely cause catastrophic health effects. Such a consequence would be unduly prejudicial.").

This is no idle concern—inmates are catching the virus and dying while these motions are litigated.  On April 1st, a district court in Northern Florida commuted a life sentence for a defendant named Andre Williams to time-served with 12-months home confinement, finding age and medical conditions created significant risk of "life threatening illness should he be exposed to COVID-19 while incarcerated." *United States v. Williams*, No. 04-cr-95, Dkt. No. 91 at *7 (N.D. Fla. Apr. 1, 2020).  Before the order granting release was filed, Mr. Williams contracted coronavirus in FMC

Butner.  He died April 12.[21]  In these dire circumstances, the Court should waive the

30-day waiting period.

## II. The COVID-19 Pandemic Presents an Extraordinary and Compelling Reason for Mr. McCord's Compassionate Release Due to His Particular Vulnerability.

### A. This Court can determine that COVID-19 presents an extraordinary and compelling reason for compassionate release.

Under Section 3582(c)(1)(A)(i), this Court "may reduce the term of

imprisonment" if it finds that "extraordinary and compelling reasons warrant such a

reduction . . . and that such a reduction is consistent with applicable policy statements

issued by the Sentencing Commission[.]"  The Sentencing Commission has issued a

policy statement that provides factual considerations for determining whether

compassionate release is appropriate.   Those considerations include three

enumerated categories of "reasons" – relating to defendant's medical condition, age,

and family circumstances – as well as a "catchall" provision: any "other reasons" as

determined by the BOP.  U.S.S.G. § 1B1.13, Application Note 1(A).[22]  However, this

policy statement is outdated[23] and inconsistent with the First Step Act to the extent

---

[21] *See* Bur. of Prisons, *Inmate Locator* (available at: https://bit.ly/2XDfgZe) (a search shows inmate Andre Williams died April 12, 2020).

[22] Additionally, the commentary makes clear that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."  U.S.S.G. § 1B1.13, Application Note 2.  In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not preclude consideration for a [sentence] reduction."  *Id.*

[23] Since the passage of the First Step Act, there have not been enough commissioners to update the Commission's policies or amend the Sentencing Guidelines. *See United States v. Brown*, No. 4:05-CR-00227-1, 2019 WL 4942051 at *2 n.1 (S.D. Iowa Oct. 8, 2019) ("As district courts have noted often this year, the

it provides that only the BOP may determine what "other reasons" qualify as "extraordinary and compelling."[24]

It is the role of the courts to determine what "other reasons" warrant compassionate release, notwithstanding the Commission's outdated policy statement that provided for BOP to make that determination. *See United States v. Maumau*, 2:08-cr-758-TC, 2020 WL 806121, at *7-8 (D. Utah Feb. 18, 2020). Numerous courts have recognized the judicial authority to find that compassionate release is warranted for "other reasons" than those set forth in U.S.S.G. § 1B1.13. *See, e.g.*, *United States v. Poulios*, No. 2:09-cr-00109-RAJ-TEM, 2020 WL 1922775, at *2 (E.D. Va. Apr. 21, 2020) ("[T]he court may consider a combination of factors including but not limited to those listed in Application Note 1 in evaluating a petitioner's request for a sentence modification under the 'catch-all' provision."); *United States v. Redd*, Case No. 1:97-cr-00006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) ("[T]he Court joins other courts in concluding that a court may find, independent of any

_____

Sentencing Commission has not amended the Guidelines following the First Step Act and cannot do so until it again has four voting commissioners.").

[24] *See United States v. Perdigao*, No. 07-103, 2020 WL 1672322, at *2 (E.D. La. Apr. 2, 2020) ("Many courts have concluded that . . . the Sentencing Commission does not have a policy position applicable to motions for compassionate release filed by defendants pursuant to the First Step Act."; *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020) ("'the scope of the old policy statement is clearly outdated and, at the very least, does not apply to the entire field of post-First Step Act motions . . . . Therefore, the policy statement may provide 'helpful guidance' but does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i).'"); *United States v. Cantu-Rivera*, No. H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019) ("Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect." (internal citation omitted).

motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C)").

There is ample precedent to support compassionate release in light of prisoners' particular susceptibility and vulnerability to COVID-19. Courts in the Fourth Circuit and across the country have found that a defendant's heightened risk and particular vulnerability to COVID-19 in prison constitutes an "extraordinary and compelling reason" in favor of compassionate release.[25]

Alternatively, this Court has also recognized that the "gross disparity" between the sentence that the defendant received and the sentence that he would have received after passage of the First Step Act presented an "extraordinary and

---

[25] *See, e.g.*, *United States v. Poulios*, No. 2:09-cr-00109-RAJ-TEM, 2020 WL 1922775, at *3 (E.D. Va. Apr. 21, 2020) (finding "extraordinary and compelling reasons to modify [defendant's] sentence because of the great risk that COVID-19 poses to a person of [defendant's] age with underlying health conditions"); *Dinning v. United States*, No. 2:12-cr-84, 2020 WL 1889361, at *2 (E.D. Va. Apr. 16, 2020) ("[T]he confluence of petitioner's medical conditions and the COVID-19 pandemic may constitute an extraordinary and compelling reason for sentence modification . . . ."); *United States v. Jones*, No. 3:11-cr-249 (E.D. Va. Apr. 3, 2020) (granting compassionate release and converting remainder of sentence to home confinement in light of "the current public health crisis caused by COVID-19"); *United States v. Edwards*, No. 6:17-cr-3-NKM, 2020 WL 1650406, at *6 (W.D. Va. Apr. 2, 2020) (granting compassionate release); *United States v. Collins*, No. CCB-10-336, 2020 WL 1506176 (D. Md. Mar. 30, 2020) (granting compassionate release to a "non-violent drug offender who has already served a lengthy sentence" even though "it has not been proffered that [defendant] has an underlying health condition which makes him more susceptible to the effects of the virus, and while the risks posed by a defendant's continued residence in a detention facility do not necessarily mandate release"); *United States v. Copeland*, Case No. 2:05-CR-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments defendant has during this current pandemic").

compelling reason" for compassionate release.  *Redd*, 2020 WL 1248493.  Although the Court's decision in *Redd* did not address the coronavirus (it was not at issue), it speaks to the issue presented here: if Mr. McCord is not released, he faces the potential of severe illness and death sentence, which is not what Congress or the Court intended at sentencing.  *See, e.g., Edwards*, 2020 WL 1650406, at *6 ("Had the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in federal prison would expose him to a heightened and substantial risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not have sentenced him to the latter 18 months.").  The Court may grant compassionate release to avoid such a gross disparity.

B. Mr. McCord is particularly susceptible to contracting COVID-19 because of his conditions of confinement.

Since January 2020, COVID-19 has spread widely – and rapidly – throughout the United States.  Positive cases have been confirmed in all 50 states and the District of Columbia.[26]  Since March 21, 2020, the total number of confirmed cases in the United States has skyrocketed from 15,219 to 1,938,823 as of June 8; the number of deaths has risen from 201 to 110,375.  *Id*.  As of June 8, 2020, the Bureau of Prisons reported that 6,025 inmates and 637 staff members have tested positive for COVID-19.[27]

---

[26] *See* CDC, *COVID-19 Cases in the US*, available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[27] *See* Fed. Bur. of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/ (includes recovered cases).

These numbers are growing every day, and almost certainly understate the problem, as the United States in general, and prisons in particular, are vastly behind where they need to be in testing for this virus.  Given the rapid onset of symptoms and the fact that many carriers are asymptomatic, the unfortunate reality is that once there is a positive case, it may be too late to prevent further spread in a prison.

The nation's prison system is particularly ill-equipped to handle the spread of a disease as contagious and deadly as COVID-19.  COVID-19 can enter a facility and spread rapidly, *entirely undetected*.  Indeed, the Director of the CDC recently warned that up to 25 percent of people infected with COVID-19 "may not show symptoms."[28] The virus has already spread rapidly in BOP and state facilities.[29]   Due to the crowded and confined nature of a detention facility, the spread of the virus in the prisons and jails is far outpacing its spread in the community.

---

[28] Apoorva Mandavilli, "Infected but Feeling Fine: The Unwitting Coronavirus Spreaders," *New York Times* (March 31, 2020) available at https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html (last visited Apr. 24, 2020).  *See also* CDC, "How Coronavirus Spreads" webpage ("Some recent studies have suggested that COVID-19 may be spread by people who are not showing symptoms."), available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 24, 2020)

[29] *See* Timothy Williams, Benjamin Weiser and William K. Rashbaum, "'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars," *New York Times* (Mar. 30, 2020), *available at* https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html (last visited April 1, 2020) ("Hundreds of Covid-19 diagnoses have been confirmed at local, state and federal correctional facilities — almost certainly an undercount, given a lack of testing and the virus's rapid spread — leading to hunger strikes in immigrant detention centers and demands for more protection from prison employee unions").

Conditions of confinement create the ideal environment for the transmission of contagious disease.[30]   In fact, the top two hotspots of COVID-19 in the United States are both prisons: Marion Correctional Institution reported that 81% of its population (2,011 inmates) have tested positive, and Pickaway Correctional Institution reported 77% (1,536 inmates) have tested positive.[31]   "Prisons are petri dishes for contagious respiratory illnesses."[32]   Inmates cycle in and out of jails and prisons, and people who work in the facilities leave and return daily.   According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[33]   Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[34]   The

---

[30]  Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at https://doi.org/10.1086/521910.

[31]  Catherine Candisky, "Coronavirus surges at Pickaway prison, now No. 2 hot spot in nation – behind Marion prison," *The Columbia Dispatch* (Apr. 23, 2020), available at https://www.dispatch.com/news/20200422/coronavirus-surges-at-pickaway-prison-now-no-2-hot-spot-in-nation---behind-marion-prison.

[32]  *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

[33]  "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[34]  *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) at https://bit.ly/2TNcNZY.

conditions of confinement not only affect incarcerated individuals, but also the community at large. "With 2.3 million people in the United States in prison or jail on any given day, an outbreak in these facilities poses a threat to the entire country."[35] One COVID-19 model estimates that jails, as currently managed, could account for 99,000 deaths that have not be recognized by other models.[36]

Courts across the country have found that prisoners are at grave risk. "Even in the best run prisons, officials might find it difficult if not impossible to follow the CDC's guidelines for preventing the spread of the virus among inmates and staff: practicing fastidious hygiene and keeping a distance of at least six feet from others." *United States v. Esparza*, No. 1:07-cr-00294-BLW, 2020 WL 1696084 (D. Idaho. Apr. 7, 2020). Unfortunately, BOP's efforts have not protected inmates.[37]

---

[35] *Explainer: Prisons and Jails Are Particularly Vulnerable to COVID)-19 Outbreaks*, The Justice Collaborative, available at https://thejusticecollaborative.com /wpcontent/uploads/2020/03/TJCVulnerabilityofPrisonsandJailstoCOVID19Explain er.pdf.

[36] *See COVID-19 Model Finds Nearly 100,000 More Deaths Than Current Estimates, Due to Failures to Reduce Jails*, ACLU (Apr. 22, 2020), available at https://www.aclu.org/sites/default/files/field_document/aclu_covid19-jail-report_2020-8_1.pdf.

[37] *See, e.g., United States v. Atwi*, No. 18-20607, 2020 WL 1910152, at *4 (E.D. Mich. Apr. 20, 2020) ("Positive cases among federal prisoners continue to rise, and it does not appear that preventative measures are sufficiently working yet to flatten the curve in BOP facilities."); *United States v. Razzouk*, No. 11-CR-430 (ARR), Dkt. No. 136 at 8 (E.D.N.Y. Apr. 19, 2020) (BOP's efforts at FCI Otisville "did not protect [defendant] from exposure to the disease in the first instance, despite his vulnerable status"). *United States v. Muniz*, Case No. 4:09-cr-199, 2020 WL 1540325, at *1 (S.D. Tex. Mar. 30, 2020) ("[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers . . . demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection.").

C. Mr. McCord is more likely to suffer severe or fatal effects of COVID-19 because of his health condition.

Older individuals and people with preexisting health issues are particularly at risk of experiencing severe side effects or death as a result of this virus. According to the CDC, the following groups are at high risk for severe illness from COVID-19: (1) people aged 65 and older; (2) people who live in a nursing home or long-term care facility; and (3) people with high-risk conditions, such as chronic lung disease or moderate to severe asthma, serious heart conditions, people who are immunocompromised,[38] obese, or have diabetes, renal failure, or liver disease.[39]

According to Mr. McCord's BOP medical records, he is pre-diabetic, has elevated blood pressure without hypertension, and he is obese.[40] Since 2016, he has had an impaired fasting glucose and has been counseled concerning pre-diabetes.

In May 2018, he weighed 290 pounds and was measured at 5'9". This is the last recorded date of his height and weight in his records. However, "obesity" is listed as one of his health problems as late as October 2019. According to the CDC, his body mass index (BMI) is 42.82, and he is obese.[41] The CDC includes individuals of any age with severe obesity (a BMI of 40 or higher) is a risk of becoming severely ill should

---

[38] Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of cortisteroids and other immune weakening medications.

[39] See CDC, People Who are at Higher Risk, available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html.

[40] Counsel will move to have Mr. McCord's medical records filed under seal.

[41] Available at https://www.cdc.gov/widgets/healthyliving/index.html.

they contract COVID-19.[42]   Individuals with severe obesity are particularly vulnerable because their condition "increases the risk of a serious breathing problem called acute respiratory distress syndrome (ARDS), which is a major complication of COVID-19 and can cause difficulties with a doctor's ability to provide respiratory support for seriously ill patients. People living with severe obesity can have multiple serious chronic diseases and underlying health conditions that can increase the risk of severe illness from COVID-19."[43]

Courts have granted compassionate release to individuals based on their medical conditions, which included obesity, hypertension, and diabetes.  *See United States v. Ullings,* No. 1:10-cr-00406, 2020 WL 2394096 (N.D. Ga. May 12, 2020) (hypertension and obesity); *United States v. Foreman,* No. 3:19-cr-62 (VAB) 2020 WL 2315908 (D. Conn. May 11, 2020) (hypertension and obesity); *United States v. Lacy,* No. 15-cr-30038, 2020 WL 2093363 (C.D. Ill. May 1, 2020) (severe obesity, hypertension, and diabetes).

While adults over sixty years old and people with chronic medical conditions are at heightened risk for COVID-19, young, otherwise healthy individuals are not immune from infection.  Data from the Centers for Disease Control and Prevention (CDC) shows that nearly 40 percent of patients hospitalized from coronavirus were

---

[42]   Available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

[43]   Available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

20 to 54 years old.[44]  In Virginia, 19- to 49-year-olds comprise more than 27 percent of all cases in the state.[45]  With the recent and dramatic spike in cases that indicates community spread, we must take every necessary action to protect not only vulnerable populations, but the community at large.

In sum, Mr. McCord's particular susceptibility to COVID-19 while incarcerated, in combination with the mortal risk to him given his medical conditions, constitutes an extraordinary and compelling reason warranting his compassionate release.

### III. Releasing Mr. McCord is appropriate given his history and characteristics and his rehabilitation while incarcerated.

Mr. McCord's sentence should be reduced because he is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). *See* U.S.S.G. § 1B1.13(2).  Furthermore, the relevant 18 U.S.C. § 3553(a) factors favor a sentence reduction.

A. Mr. McCord is not a danger.

Counsel is mindful of Mr. McCord's offenses of conviction.  However, since the commission of the offense conduct, he has made a significant effort to rehabilitate himself.  That rehabilitative effort is discussed on page 8 of the recently-filed motion to reduce sentence pursuant to the First Step Act of 2018.  Attached to that motion is

---

[44] *Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in U.S.*, The New York Times (Mar. 20, 2020), at https://www.nytimes.com/2020/03/18/health/coronavirus-young-people.html (last visited March 31, 2020).

[45] Virginia Department of Health, *COVID-19 in Virginia*, available at http://www.vdh.virginia.gov/coronavirus/.

Mr. McCord's progress report, as well as numerous certificates from some of the programs that he has completed thus far.  As indicated in those documents, Mr. McCord has completed 66 classes since his incarceration.  He is currently enrolled in Recreation NFPT, the FCI CDL Prep Class, and Starting and Incorporating a Business.  He is also currently enrolled in the L.E.A.D. Program.  This program is described as "a 12-month cognitive-behavioral (skill-building) program designed to help inmate participants enhance their leadership, problem solving, communication, decision making and other necessary skills that play a critical role in community reintegration."  Mr. McCord has also completed the Vocational Training Microsoft, Vocational Training Core Curriculum, Introduction to Culinary Arts, and the Culinary Arts Program.

A number of the classes he took address issues related to his involvement in criminal activity.  Mr. McCord has taken the following courses: Alternatives to Violence (2010); Special Management Unit—Psychology Level One: Anger, My Life Story (2012); What's Wrong With Holding In My Anger (2013); Special Management Unit—Psychology Level Two: Reasons to Change, Introduction to Functional Thinking, Faulty Thinking and Functional Thinking (2013); Special Management Unit—Psychology Level Three: Living a Nonviolent Life, Parts 1 & 2, Problematic Behaviors (2013); Special Management Unit—Psychology Level Four: Understanding Yourself, Parts 1 & 2, Change Plan (2013); Managing Your Stress (2013); Functional Behaviors: Making Choices That Work (2013); Coping Skills for Relapse Prevention (2014); and Anger Management and Stress Management (2020).  He also completed

the Drug Education Program in 2010 and the Non-Residential Drug Abuse Program in 2015.

Mr. McCord has served most of his sentence for the instant offense and is due to be released on September 5, 2029. Given the insidiousness of COVID-19 combined with Mr. McCord's health condition, continuing to incarcerate him for the remainder of his sentence, as opposed to home incarceration, is unwarranted. He is now 46 years old. It is undisputed that the risk of recidivism diminishes with age. Moreover, courts have granted compassionate release in cases involving violent offense conduct. *See, e.g.*, *United States v. Williams*, No. 3:04cr95/MCR, 2020 WL 1751545 (N.D. Fla. Apr. 1, 2020) (granting compassionate release for defendant convicted of armed bank robbery and firearms offenses); *United States v. McCarthy*, No. 3:17-CR-0230, 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (granting compassionate release to a defendant convicted of armed bank robbery).

Indeed, by reducing the potential spread of COVID-19 within the prison system, Mr. McCord's release would benefit public safety. *See, e.g., United States v. Harris*, No. 19-cr-356, 2020 WL 1482342, at *1 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by

Defendant's release to home confinement on . . . strict conditions.").[46]  Mr. McCord's

release would also reduce the existing strain on BOP's healthcare facilities.[47]

Finally, Mr. McCord has strong support in the community.  This will be

essential to his successful reintegration to society upon release.  He has maintained

close ties with his family throughout his time in prison.  Backed by this support, and

in light of his history, there is no reason to believe Mr. McCord would present a

danger to society.

B.  The § 3553(a) factors Mr. McCord weigh in favor of relief.

Mr. McCord has remained in continuous custody since his arrest on July 20,

2006, and therefore has been incarcerated for nearly 14 years.  As a result, requiring

him to serve the last portion of his sentence on home incarceration further

accomplishes the retribution and incapacitation sentencing factors under Section

---

[46] *See also United States v. Davis*, No. 1:20-cr-9-ELH, 2020 WL 1529158, at *4 (D. Md. Mar. 30, 2020) ("If released, Davis will be removed from a custodial setting where the risk of infection is higher for everyone, including the healthy, and he will live in the community where he is able to practice social distancing, self-quarantine, self-isolate if infected, and seek medical treatment if necessary."); *United States v. Mclean,* No. 19-cr-380, Dkt. No. 21 (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Jaffee*, No. 19-cr-88, Minute Order (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement").

[47] *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, Office of the Inspector General (March 2016), available at https://oig.justice.gov /reports/2016/e1602.pdf (detailing BOP's medical staff shortages).

3553(a).  It also accounts for the mitigating history he brought before the court at the time of his sentencing.  This included being raised by an alcoholic father that often abused Mr. McCord's mother, and a long history of substance abuse.

There is no doubt that Mr. McCord's prior criminal conduct was serious. However, he has served the majority of his sentence, and he has support from family in the community.

C. <u>Mr. McCord has a viable release plan.</u>

Each day in custody is increasingly risky for Mr. McCord, who has no way to practice "social distancing" or other protectives measures that are mandated by health officials throughout the nation and which promise some hope of surviving the consequences of infection.  He has formulated a release plan that will adequately address the concerns presented by COVID-19, protect the public, and ensure his successful transition into the community, which includes living with his mother, Geraldine McCord.

## CONCLUSION

Mr. McCord respectfully requests that this Court order his immediate compassionate release and impose the following supervised release conditions: 1) that he abide by the standard supervised release conditions; 2) that within 72 hours of release, he contact the U.S. Probation Office by phone for specific reporting instructions; 3) that he reside with Geraldine McCord and be confined to the home— except when attending medical appointments or other activities approved by the U.S. Probation Office – until as long as this Court deems necessary.

In the alternative, the defense respectfully requests that the Court issue a non-binding recommendation that BOP transfer Mr. McCord to home confinement for the maximum period permissible, pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020), 18 U.S.C. § 3624(c)(2), the Second Chance Act of 2007, and 18 U.S.C. § 3621.[48]

> Respectfully submitted,
> LAMONT E. MCCORD
>
> By:_____/s/_____
>              Counsel

Nia Ayanna Vidal, Esq.
Va. Bar # 48871
Assistant Federal Public Defender
Eastern District of Virginia
701 E. Broad Street, Suite 3600
Richmond, VA   23219
(804) 565-0875
(804) 648-5033 (fax)
Nia_Vidal@fd.org

---

[48] While BOP has sole authority to determine whether Mr. McCord is suitable for transfer to home confinement pursuant to Section 3624, this Court has the power to make a recommendation, and the BOP is required to consider a sentencing court's recommendation as to where a prisoner should serve his sentence.  18 U.S.C. § 3621(b)(4).  Such a recommendation is not part of the sentence subject to appeal. *United States v. Smith*, 733 Fed. Appx 86, 88 (4th Cir. 2018), citing *United States v. Ceballos*, 671 F.3d 852, 856 (9th Cir. 2011) (citing other circuits finding the same). Accordingly, sentencing courts may make these "nonbinding recommendations to the Bureau of Prisons at any time.' *Ceballos*, 671 F.3d at 856 n.2.